# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 150 | **DATE** | 7/2/2002 |
| **CASE TITLE** | Richard A. Kastman vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. Plaintiff's motion for summary judgment [18-1] is granted in part and denied in part. This case is remanded to the Commissioner for further proceedings consistent with this decision.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUL 0 3 2002 | |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 26 |
| | Copy to judge/magistrate judge. | | | |
| | | | 7/2/2002 | |
| | | | date mailed notice | |
| IS | courtroom deputy's initials | | IS | |
| | | | mailing deputy initials | |

CLERK U.S. DISTRICT COURT

02 JUL -2 PM 4:59

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD A. KASTMAN,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 01 C 0150 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **JO ANNE B. BARNHART,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Richard Kastman seeks judicial review of the Commissioner's final decision denying Kastman Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Kastman claims that the administrative law judge (the "ALJ") erred by failing to comply with the remand order of the Appeals Council, by substituting his opinion for that of a medical expert, by ignoring evidence favorable to Kastman, by failing to make proper credibility findings, and by failing to use the services of a vocational expert. Kastman argues that any one of these errors warrants reversal of the ALJ's decision and an award of benefits to Kastman in light of the history of this case. For the following reasons, this Court grants Kastman's motion in part and denies it in part.[1]

---

[1] The parties have consented to have this Court conduct any and all proceedings, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b).

# I. Procedural Background

Kastman applied for DIB and SSI on March 29, 1992, claiming that he was disabled due to depression, a nervous disorder, chest and left arm muscle spasms, sexual dysfunction, and alcoholism since October 1, 1978. (R. at 104-07, 134-37, 145-47, 167.) His insured status expired on September 30, 1984. (R. at 160.)

The Social Security Administration denied both of Kastman's claims initially and on reconsideration. (R. at 130-32, 139-41, 149-51, 153-55.) As a result, Kastman requested review of the Social Security Administration's denials before an administrative law judge. The Social Security Administration granted Kastman's request, and on June 13, 1996, ALJ André Trawick held a hearing at which he elicited testimony from Kastman, who was represented by counsel, Dr. Dennis Anderson, a medical expert, and Dr. John Grenfell, a vocational expert. (R. at 53.) Approximately six months later, ALJ Trawick issued a decision denying Kastman DIB and SSI. (R. at 383-90.)

Kastman appealed ALJ Trawick's decision to the Appeals Council. On December 4, 1997, the Appeals Council granted Kastman's request for review and remanded the case to an administrative law judge for further proceedings to address certain issues. (R. at 410-11.) On March 17, 1999, a hearing was held before ALJ Joseph Brezina. ALJ Brezina elicited testimony from Kastman, who was represented by counsel, and Dr. Brockman Schumacher, a vocational expert. (R. at 471.) About one month later, ALJ Joseph Brezina issued a decision finding Kastman not disabled. (R. at 22-29.)

Soon thereafter Kastman appealed ALJ Brezina's decision to the Appeals Council. But this time the Appeals Council denied Kastman's request for review (R. at 6-7), thereby making

ALJ Brezina's decision the final decision of the Commissioner. Kastman now seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.　The Initial Hearing

### A.　Factual Background

Kastman was born on September 24, 1959, making him thirty-six at the time of the hearing before ALJ Trawick. (R. at 56.) Kastman did not graduate from high school, but he received his GED. (R. at 57.) Kastman has not received vocational training of any kind. (R. at 57.)

Kastman's work history spans from 1973 to 1990. While attending high school, Kastman worked at a country club in the coat room and golf cart area. After that, Kastman worked at a golf course for a few months, mowing and watering the grass. (R. at 59.) Kastman next worked at a factory for a couple of weeks, until he was fired for alcohol use. (R. at 59.) Subsequently, Kastman worked as a custodian at a church, but he was fired for flashing. (R. at 59-60.) Following that experience, Kastman delivered newspapers for a few months, and then he delivered dairy products for a short while. Kastman was fired from the latter position because he was unable to get along with coworkers. (R. at 60.) Other than the country club job, Kastman did not hold any of the aforementioned jobs longer than two months. (R. at 60.)

Kastman believed that he could not work because of the condition of his right knee—a slight twist would injure it—his depression, and his personality disorder. (R. at 61.) Kastman's depression made him feel unmotivated to do anything—it caused "a blah feeling." (R. at 62.) In addition, Kastman had thoughts of suicide, and it was difficult for him to fall asleep. (R. at

- 3 -

62-63, 71.) Kastman's personality disorder made it difficult for him to get along with people. (R. at 63.) He often became angry with people and wanted to hurt them. (R. at 72-73.)

Kastman also stated that he had a hard time concentrating on things and that he felt nervous all of the time. (R. at 71-73.) When reading, Kastman's mind would drift off into something else. (R. at 72.) He always had a difficult time sitting still. (R. at 73-74.)

Kastman informed ALJ Trawick that Kastman was incarcerated at the time of the hearing for engaging in sexual deviate behavior with children. (R. at 62.) He had been incarcerated for the better part of the previous seventeen years for this reason, and he was in therapy to help control the problem. (R. at 65, 69.) At times Kastman was intoxicated when he engaged in sexual deviate behavior with children, while at other times he was not intoxicated when he engaged in such behavior. (R. at 78.) At the correctional center, Kastman had a job washing dishes in the dish room. He worked alone. (R. at 68-69.) In his free time, Kastman enjoyed listening to music and going to the art and recreation area. (R. at 64-65.)


## B.    Medical Evidence

In October 1978, Kastman was admitted to Lutheran General Hospital because of low self-esteem, doubts about his masculinity, depression, anxiety, difficulties with control of sexual impulses, and alcohol abuse. (R. at 201.) At the time, Kastman was on bond from DuPage County Jail; he had spent twenty days there for requesting oral genital contact from minor boys. (R. at 201.) A physician noted that Kastman had difficulty sleeping and concentrating, that Kastman was anxious, and that Kastman had suicidal thoughts. (R. at 201-02.) The physician diagnosed Kastman with depressive neurosis with masculine identity difficulties, alcohol abuse,

and schizoid trends. The physician discharged Kastman to home in November 1978 with medication and instructions to get a job and attend AA. Kastman's prognosis was fair. (R. at 204.)

Medical progress notes of the State of Illinois Department of Corrections dated from January 1988 through July 1989 are generally insignificant. On occasion, Kastman complained of difficulty sleeping and feeling anxious. (R. at 227, 229, 234-36, 241, 244.) On May 15, 1989, however, Kastman overdosed on prescription drugs that belonged to someone else. (R. at 241-42, 251.) He was found drooling, disoriented, staggering, and walking into walls. (R. at 241-42.)

In March 1988, Dr. Donald Holland completed a report of consultation on Kastman. Dr. Holland noted that Kastman had a history of chronic alcoholism, consuming at least a fifth of whiskey per day, and of molesting minor children. Dr. Holland diagnosed Kastman as suffering from chronic alcohol abuse and sexual deviancy. (R. at 270.) Dr. Marion Page completed reports of consultation on Kastman from August 1988 through June 1989. Dr. Page believed that Kastman suffered from insomnia and anxiety and prescribed Kastman various medications. (R. at 257, 260-61, 264, 266.)

In July 1989, Dr. Charles Levie diagnosed Kastman with a dysthymic disorder and pedophilia. (R. at 247.) Dr. Levie did not believe that Kastman's pedophilia was amenable to treatment considering his attitude. He prescribed Kastman medication to control his anxiety. (R. at 247.) On July 6, 1989, Dr. Francis Benham evaluated Kastman and opined that the data on Kastman predicted that his day to day functioning would be significantly disrupted. (R. at 249.)

Nearly three years later, Dr. Luis Planas completed a medical questionnaire. Dr. Planas diagnosed Kastman with muscle spasms of the left chest, shoulder, and arm. (R. at 279.) Kastman's range of motion was unimpaired. (R. at 280.) Kastman's muscle spasms could not be reproduced during the examination. (R. at 281.)

On June 4, 1992, Dr. E.C. Bone completed a Residual Physical Functional Capacity Assessment of Kastman. Dr. Bone opined that Kastman could lift or carry fifty pounds occasionally and twenty-five pounds frequently, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull without limitation. (R. at 110.) Dr. Bone placed no limitations on Kastman's ability to climb, stoop, kneel, crouch, or crawl. (R. at 111.) Two days later, on June 6, Dr. David Benson performed a psychiatric evaluation on Kastman. Kastman complained of depression, anxiety, and insomnia, and he stated that he had been convicted three times for aggravated criminal sexual abuse. (R. at 282.) He once had sexual contact with minor girls and stated that he had thoughts of repeating the act. (R. at 282-83.) Kastman also stated that he drank in binges over the past sixteen years, consuming about a fourth of a gallon of vodka per binge. (R. at 283.) In addition, Kastman smoked marijuana in high school. Dr. Benson diagnosed Kastman with chronic alcohol dependence, marijuana abuse, possibly in remission, pedophilia, and personality disorder NOS with schizoid features. Dr. Benson felt that Kastman's prognosis was poor. (R. at 284.)

On July 11, 1992, Ira Gilbert completed an Alcohol and Drug Evaluation Uniform Report. Gilbert opined that Kastman could not control his drinking and that he had symptoms of alcohol dependence. (R. at 289.)

About two weeks later Dr. Carl Hermsmeyer completed a Mental Residual Functional Capacity Assessment of Kastman. He found that Kastman's ability to understand and remember detailed instructions and to carry out detailed instructions were moderately limited, but that Kastman's other abilities were not significantly limited. (R. at 117-18.) Overall, Dr. Hermsmeyer opined that Kastman had the mental capacity to perform simple tasks. (R. at 119.) On a Psychiatric Review Technique Form, Dr. Hermsmeyer concluded that Kastman had a substance addiction disorder and a personality disorder NOS with schizoid features. (R. at 126-27.) Under Listing 12.09(D), Dr. Hermsmeyer determined that Kastman's activities of daily living were slightly limited, that Kastman's social functioning was slightly limited, and that Kastman seldom had deficiencies of concentration, persistence, or pace. (R. at 128.) There was insufficient evidence of an episode of deterioration in work. (R. at 128.)

On June 17, 1994, Dr. S.D. Parwatikar evaluated Kastman. During the evaluation, Kastman expressed his displeasure over being sent to a maximum security facility as a sexually dangerous person; he did not believe that he was a sexually dangerous person. (R. at 357.) Kastman narrated his criminal history to Dr. Parwatikar, his drinking problem, and his problems with anxiety and depression. (R. at 357.) At one point, Kastman admitted that he liked to expose himself for the thrill, but did not believe that such conduct created problems for the victims because he was not actually in contact with them. (R. at 357.) Dr. Parwatikar diagnosed Kastman with exhibitionism, pedophilia, and alcohol dependence. (R. at 358.) From July 1994 through January 1995, Kastman periodically saw Dr. Parwatikar. Kastman complained of anxiety and insomnia, and Dr. Parwatikar prescribed medication. (R. at 359-63.)

Dr. Mark Carich evaluated Kastman in April 1995. Dr. Carich noted that Kastman's criminal history included an attempt at indecent liberties with a minor female in 1979, attempted aggravated sexual abuse with a minor in 1984, aggravated criminal sexual abuse with a minor in 1987, and being found sexually dangerous in 1993. Dr. Carich also noted that, in total, Kastman's victimology included twenty-six minors. (R. at 364.) Dr. Carich opined that Kastman had a variety of behavioral problems including antisocial, narcissistic, and schizoidal. (R. at 364.) Dr. Carich diagnosed Kastman with paraphilia NOS with features of exhibitionism and pedophilia, polysubstance abuse, and a personality disorder NOS with features of antisocial, narcissistic, and schizoidal. (R. at 365.)

In May 1995, Dr. Dora Weaver performed a psychological evaluation on Kastman, subjecting him to several tests: a Wechsler Adult Intelligence Scale-Revised (WAIS-R), which revealed that Kastman was within the low average range of intellectual functioning with a full scale IQ score of 84; a Bender Gestalt Test; a House-Tree-Person Test; an Incomplete Sentence Blank Test; a Minnesota Multiphasic Personality Inventory-2 Test; a Thematic Apperception Test; and a Rorschach Inkblot Test. (R. at 366-73.) Dr. Weaver diagnosed Kastman with pedophilia, exhibitionism, alcohol dependency, a dysthymic disorder, a personality disorder NOS, and a schizoidal personality disorder. (R. at 373.) Dr. Weaver observed that Kastman denied having a sexual problem and that he rationalized his previous sexual misconduct to his use of alcohol. Dr. Weaver emphasized that alcohol treatment without in-depth psychotherapy would result in a poor prognosis for Kastman; with control of his drinking, Kastman would likely use other sources to justify his sexual acting out. (R. at 373.)

- 8 -

## C.  Dr. Anderson's Testimony

Dr. Anderson opined that Kastman had a complex profile. Kastman had dysthymia and a personality disorder with antisocial and narcissistic features. He also had a history of exhibitionism, pedophilia, and alcohol abuse. (R. at 81-82.) Dr. Anderson believed that Kastman's antisocial behavior was related to his pedophilia, but that the pedophilia came first. If Kastman did not suffer from pedophilia, then Dr. Anderson believed that Kastman would be able to manage himself. (R. at 84-85.)

Based on the criteria of Listing 12.08, personality disorder, Dr. Anderson concluded that, prior to 1984, Kastman's daily living activities were moderately limited, his social functioning was moderately limited, and he often had deficiencies of concentration, persistence, or pace. (R. at 86-87.) In light of Kastman's job history, Dr. Anderson opined that Kastman had repeated episodes of deterioration in work. (R. at 87-88.) Dr. Anderson believed that these limitations would remain the same regardless of whether the evidence established that Kastman engaged in sexual deviate behavior only while intoxicated. (R. at 89.)

When asked if Kastman suffered from an anxiety disorder, Dr. Anderson said that such a disorder was not identified, but he recognized that one would feel anxiety over being incarcerated and not being able to make changes in one's life. (R. at 91.) With respect to Kastman's ability to get along with others, Dr. Anderson agreed that Kastman had a problem, but Dr. Anderson indicated that Kastman's problem was consistent with an individual who has antisocial traits and spent a lot of time in prison. (R. at 91-92.)

## D.    Vocational Expert

Dr. Grenfell testified last at the hearing before ALJ Trawick.  Dr. Grenfell classified Kastman's milk delivery and custodian positions as unskilled and light.  (R. at 96-97.)  When asked what type of work a person of Kastman's age and with Kastman's work experience and education could perform if that person was restricted to light work with a sit and stand option, felt depressed and jittery, had a sleeping problem, and was primarily a loner, such that he could have only minimal contact with the public, Dr. Grenfell responded, "Car detailing for an automobile dealer," "forklift operator," "inventory clerk," and "custodial work," assuming the person's ability to engage in daily living activities and to function socially were only slightly limited and the person had only slight deficiencies of concentration, persistence, or pace.  (R. at 97-98.)  Approximately 2500 car detailing jobs, 6000 forklift operator jobs, 6000 inventory clerk jobs, and 8000 custodial jobs existed in Illinois.  (R. at 98-99.)  Upon further questioning, Dr. Grenfell explained that all of these jobs would be available to a pedofile.  (R. at 99.)  However, Dr. Grenfell opined that none of these jobs would be available to a person with moderately limited daily living activities and social functioning, with deficiencies in concentration, persistence, or pace often, and with more than three episodes of deterioration in work.  (R. at 100-01.)


## E.    ALJ Trawick's Decision

After considering the evidence and testimony narrated above, ALJ Trawick found that Kastman was not disabled.  In particular, ALJ Trawick concluded that Kastman had not engaged in substantial gainful activity since his alleged onset date, that Kastman suffered from severe

impairments of pedophilia, exhibitionism, and alcohol dependence due to incarceration and a personality disorder (R. at 387), but that Kastman's severe impairments did not meet or equal any of the impairments listed in the regulations and that Kastman could return to his past work as a custodian, which was light work. (R. at 388.) To arrive at this final conclusion, ALJ Trawick concluded that Kastman's physical impairments were minimal and that his psychological impairments caused only a slight impact on his daily living activities. (R. at 388-89.) ALJ Trawick also relied on the opinion of Dr. Grenfell, the vocational expert.

### III. The Appeals Council's Decision

On December 4, 1997, the Appeals Council granted Kastman's request for review of ALJ Trawick's decision. Upon review, the Appeals Council vacated ALJ Trawick's decision and remanded the case to an administrative law judge for resolution of the following issues: to make findings with supporting rationale relating to Kastman's mental impairments; and to make a finding on Kastman's residual functional capacity supported with appropriate rationale, considering the various expert opinions of record. (R. at 410.) On remand, the Appeals Council instructed the administrative law judge to evaluate Kastman's impairments and complete a Psychiatric Review Technique Form, to give further consideration to Kastman's maximum residual functional capacity, and, if necessary, to obtain supplemental evidence from a vocational expert to clarify the effect of Kastman's limitations on his occupational base. (R. at 411.)

## IV.    The Second Hearing

### A.    Additional Testimony from Kastman

Kastman testified that he took Motrin daily for his left knee and foot pain.  (R. at 483-84.)

On a scale of one to ten, Kastman rated his pain as a seven.  (R. at 484.)  He stated that the pain

was constant and that because of the pain he could walk for only about two to three blocks in

good weather and stand for only about fifteen to twenty minutes.  (R. at 483-84.)  Kastman also

testified that he could lift only ten to fifteen pounds because of muscle spasms in his right arm.

(R. at 483.)

Kastman admitted that he had sexual deviate thoughts almost every day.  (R. at 486.)  In

addition, Kastman cried and felt sad often, experiencing episodes of depression four days per

week with each episode lasting approximately four to five hours.  (R. at 486, 490.)  Despite this,

Kastman was not receiving treatment for his depression at the time.  (R. at 490-91.)

At the time of hearing, Kastman worked as a cook at the correctional center.  His job

duties included making salads, and he worked an eight-hour shift, five days per week.  (R. at 485,

489.)


### B.    Additional Medical Evidence

Dr. Ijaz Jatala evaluated Kastman on occasion from July 1997 through March 1998.

During this period, Kastman complained of trouble sleeping and depression.  (R. at 415-23.)  On

December 7, 1999, a group at Big Muddy River Correctional Center evaluated Kastman.  They

diagnosed Kastman with pedophilia, exhibitionism, sexual abuse of a child, a dysthymic

disorder, and a personality disorder NOS with features of antisocial, narcissistic, and schizoid.

- 12 -

They considered Kastman to be at high risk for committing another sex offense if placed back into society. (R. at 469-70.)

### C.    Additional Vocational Expert Testimony

Dr. Schumacher classified Kastman's milk delivery position as very heavy and unskilled and Kastman's cook position as light to medium and unskilled. (R. at 492.) According to Dr. Schumacher, a significant number of jobs similar to Kastman's cook position existed in the national economy, typically in the fast food industry. (R. at 492-93.) However, none of these jobs would be available if the individual working one of them was depressed for four to five hours per day, four days per week, or if the individual working one of them acted upon sexual deviate thoughts. (R. at 494-95.)

### D.    ALJ Brezina's Decision

After reviewing all of the evidence in the record, ALJ Brezina concluded that Kastman was not disabled. Specifically, ALJ Brezina determined that Kastman had not engaged in substantial gainful activity since 1978, that Kastman had severe impairments of depressive neurosis with sexual identity difficulty, alcohol abuse, and schizoid personality disorder, but that Kastman had no severe physical impairments and that Kastman's severe impairments did not meet or equal any of the impairments listed in the regulations. (R. at 25.) ALJ Brezina also concluded that Kastman had no past relevant work history, but that Kastman could perform work at all of the exertional levels, which, under section 204.00 of the Medical-Vocational Guidelines, directed a finding of not disabled.

- 13 -

In determining that Kastman could perform substantial work, ALJ Brezina discounted

Kastman's testimony about his left shoulder, arm, knee, and foot pain for several reasons, namely

that the objective evidence did not support the degree of pain alleged. (R. at 25-26.) ALJ

Brezina also discounted Kastman's testimony about his being depressed for four days per week,

pointing out that Kastman was not receiving treatment for this condition. (R. at 26.) ALJ

Brezina did find that Kastman had some nonexertional limitations in that he could perform only

simple, repetitive work with no contact with the general public or children and with limited

contact with coworkers. (R. at 26.) However, ALJ Brezina concluded that such nonexertional

limitations did not significantly erode Kastman's occupational base as per section 204.00 of the

Medical-Vocational Guidelines. (R. at 27.)

ALJ Brezina completed two Psychiatric Review Technique Forms on Kastman—one

covering the period from October 1, 1978, to September 30, 1984, the other covering the period

from October 1, 1984, to the present. On the first form, ALJ Brezina indicated the presence of a

schizophrenic disorder, an affective disorder, an anxiety related disorder, a personality disorder,

and a substance addiction disorder. ALJ Brezina found that, as a result of these disorders,

Kastman's daily living activities were slightly limited, Kastman's social functioning was

moderately limited, Kastman seldom experienced deficiencies of concentration, persistence, or

pace, and Kastman never experienced an episode of deterioration in work. (R. at 34.) On the

second form, ALJ Brezina indicated the presence of a schizophrenic disorder, an affective

disorder, and an anxiety related disorder. ALJ Brezina determined that, as a result of these

disorders, Kastman's daily living activities were slightly limited, Kastman's social functioning

was slightly limited, Kastman seldom experienced deficiencies of concentration, persistence, or pace, and Kastman never experienced an episode of deterioration in work. (R. at 39.)

## V. Discussion

### A. Standard of Review

Judicial review of the Commissioner's decision to deny benefits encompasses an assessment of the factual and legal basis of that decision. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999); *Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir. 1993). With regard to the administrative law judge's factual findings, the court's role is limited: if the administrative law judge's findings are supported by substantial evidence,[2] then the court must affirm the administrative law judge's decision. *Allen v. Sullivan*, 977 F.2d 385, 389 (7th Cir. 1992). In contrast, the court reviews the administrative law judge's application of law without deference and without regard to the volume of medical evidence that supports his findings. *White*, 167 F.3d at 373. If the administrative law judge's application of law is not properly grounded, then his decision must be set aside. *Cook v. Massanari*, No. 00 C 4157, 2001 WL 755145, at *7 (N.D. Ill. July 2, 2001); *Gavin v. Heckler*, 620 F. Supp. 999, 1000 (N.D. Ill. 1985).

---

[2] Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

**B.      Failure to Comply with the Remand Order of the Appeals Council**

Kastman's first argument on appeal is that ALJ Brezina violated 20 C.F.R. § 404.977(b) and 20 C.F.R. § 416.1477(b) by not complying with the December 4, 1997 remand order of the Appeals Council. To comply with the order, Kastman contends that ALJ Brezina was required to consider the opinions of Drs. Anderson and Grenfell, to ask Dr. Schumacher a hypothetical question, and to not treat the hearing as "totally new." To support his argument, Kastman cites to *Ruiz v. Apfel*, 24 F. Supp. 2d 1045 (C.D. Cal. 1998), and *Mann v. Chater*, No. 95 CIV. 2997(SS), 1997 WL 363592 (S.D.N.Y. June 30, 1997).

Section 404.977(b) and Section 416.1477(b) of Title 20 of the Code of Federal Regulations provide that "[t]he administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." In the instant case, on December 4, 1997, the Appeals Council instructed ALJ Brezina to "[f]urther evaluate [Kastman's] mental impairments and complete a Psychiatric Review Technique Form," "give further consideration to [Kastman's] maximum residual functional capacity," and, if warranted, "obtain supplemental evidence from a vocational expert." (R. at 411.) In more general terms, the Appeals Council told ALJ Brezina to adequately evaluate Kastman's mental impairments and provide findings and supporting rationale, and to assess Kastman's residual functional capacity and provide findings and supporting rationale that consider the expert opinions of record. (R. at 410.)

Kastman does a poor job in his briefs of linking ALJ Brezina's deleterious acts or omissions to specific orders of the Appeals Council. For instance, Kastman criticizes ALJ Brezina for failing to pose a hypothetical question to Dr. Schumacher, but, as far as we can tell,

the Appeals Council did not impose such a requirement on ALJ Brezina through the remand order. It is not too difficult, though, to determine the intended link between some of Kastman's other criticisms and specific orders of the Appeals Council. Kastman's criticism of ALJ Brezina's failure to discuss Dr. Anderson's opinion provides an example.

We pass on Kastman's argument that the Commissioner's decision in this case should be reversed because ALJ Brezina violated the Appeals Council's December 4, 1997 remand order, however. First of all, we have doubts as to whether the type of agency action taken by ALJ Brezina and the Appeals Council in the instant case, framed by Kastman as a violation of 20 C.F.R. § 404.977(b) and 20 C.F.R. § 416.1477(b), should be reviewed by the court as a final decision subject to judicial review.[3] *See* 42 U.S.C. § 405(g). Second, we address all of Kastman's criticisms below while reviewing ALJ Brezina's decision, the final decision of the Commissioner. To address Kastman's criticisms here and below would result in a waste of time and resources for no good reason.

## C.      Substitution of Opinion for that of a Medical Expert

Moving on, Kastman challenges ALJ Brezina's decision on the ground that he improperly substituted his opinion on Kastman's mental limitations for that of a medical expert. An administrative law judge's findings must be based on the testimony and medical evidence in the record. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *Wiggins v. Apfel*, 29 F. Supp. 2d 486,

---

[3] We note that Kastman raised the issue of ALJ Brezina's compliance with the December 4, 1997 remand order in an argument before the Appeals Council in 2000. (R. at 11.) The Appeals Council considered the argument, but found that the argument did not provide a basis for changing ALJ Brezina's decision. (R. at 6.) So, apparently the Appeals Council was satisfied with ALJ Brezina's compliance with the December 4, 1997 remand order.

491 (N.D. Ill. 1998). Thus, administrative law judges must not succumb to the temptation to play doctor and make their own independent medical findings. *Rohan*, 98 F.3d at 970. Administrative law judges do not possess the specialized training needed to understand and evaluate the effects of diseases, especially mental diseases. Put another way, social security claimants are entitled to a decision based on the testimony and medical evidence rather than a hunch. *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995).

Here, ALJ Brezina concluded that, between October 1978 and September 1984, Kastman's daily living activities were slightly limited, Kastman's social functioning was moderately limited, Kastman seldom had deficiencies of concentration, persistence, or pace, and Kastman never experienced an episode of deterioration in work. (R. at 34.) After October 1984, ALJ Brezina concluded that Kastman's daily living activities and social functioning were slightly limited, Kastman seldom had deficiencies of concentration, persistence, or pace, and Kastman never experienced an episode of deterioration in work. (R. at 39.) ALJ Brezina stated that Kastman's daily living activities were only slightly limited because he was capable of performing most household and self-care tasks, that Kastman seldom had deficiencies of concentration, persistence, or pace because he tested at the average range of intellectual functioning with higher scores on the verbal part of the test, and that Kastman never experienced an episode of deterioration in work based on the lack of any such evidence. (R. at 26-27.) ALJ Brezina then explained that Kastman's social functioning was moderately limited due to his drinking and resultant sexual acting out; after October 1984 Kastman has been consistently incarcerated and therefore sober, resulting in reduced social limitations. (R. at 27.)

Significantly, not once did ALJ Brezina cite to or discuss any testimony or medical evidence to support these conclusions or explanations. And, it is not apparent on which testimony or evidence ALJ Brezina relied to support these conclusions or explanations. For instance, we cannot find anything in the record to support ALJ Brezina's explanation that Kastman seldom had deficiencies of concentration, persistence, or pace because he tested at the average range of intellectual functioning with higher scores on the verbal part of the test. *See Quinones v. Chater*, 117 F.3d 29, 35 (2d Cir. 1997). For all we know, there may be no link at all between intellectual functioning and the ability to maintain concentration, persistence, or pace. We also cannot ascertain on what evidence ALJ Brezina relied to establish the causal link between Kastman's drinking and sexual acting out, as if Kastman's sexual acting out occurred only while he was intoxicated. In the decision ALJ Brezina stated that "the evidence in the record indicates that [Kastman's] only episodes of sexual 'acting out' occurred when [he] was under the influence of alcohol. This is also consistent with [Kastman's] testimony." (R. at 26.) But Dr. Parwatikar noted that Kastman liked to expose himself for the thrill, and at the hearings Kastman testified that he acted out even when not intoxicated because of impulse or desire. (R. at 78, 357.) In the background section of the decision, ALJ Brezina narrated that Kastman told Dr. Jatala that alcohol had played a big part in *all* of the instances in which Kastman had exposed himself. (R. at 24.) But actually, Kastman stated that he was intoxicated "most of the time." (R. at 419.) All of this suggests that ALJ Brezina ignored medical evidence and relied on his own independent medical findings to arrive at his conclusions. Similarly, we disagree with ALJ Brezina's statement that nothing in the record supports the existence of an episode of deterioration in work. Dr. Anderson opined that Kastman had repeated episodes of deterioration

- 19 -

in work based on his work history. This too suggests that ALJ Brezina ignored medical evidence and relied on his own independent medical findings to arrive at his conclusions.

In short, more citations to the record and more discussion of the testimony and medical evidence contained in the record are necessary before this Court can confidently say that ALJ Brezina's conclusions about Kastman's mental impairments are based on testimony and medical evidence, rather than ALJ Brezina's own independent medical findings. As a result, ALJ Brezina's decision must be set aside.


### D.    Ignoring Evidence Favorable to Kastman

Kastman's next argument on appeal calls for reversal due to ALJ Brezina's treatment of medical evidence favorable to Kastman. It is well settled that administrative law judges have a duty to articulate reasons for accepting or rejecting entire lines of evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984). A written evaluation of every piece of evidence is not required. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Yet administrative law judges may not select and discuss only the evidence that supports their ultimate conclusions. *Herron*, 19 F.3d at 333.

After reviewing ALJ Brezina's decision and the entire record, it is clear that an entire line of evidence favorable to Kastman was rejected by ALJ Brezina without articulation. This line of evidence contains the opinion of Dr. Anderson, the only medical expert to testify in this case, who opined that Kastman's activities of daily living and social functioning were moderately limited, Kastman often had deficiencies of concentration, persistence, or pace, and Kastman experienced repeated episodes of deterioration in work. (R. at 86-88.) The evidence also

includes the opinions of Drs. Levie, Benham, Benson, and Weaver. Generally speaking, all of these individuals opined that Kastman's prognosis for controlling his problems was poor. (R. at 247, 249, 284, 373.) In addition, the evidence from Drs. Page, Parwatikar, and Jatala indicates that Kastman repeatedly complained of depression, insomnia, and anxiety. (R. at 257, 260-61, 266, 359, 415-18, 422.) ALJ Brezina never mentioned or discussed any of this evidence, either.

Contrary to the Commissioner's assertion, the fact that Kastman worked at the correctional center for years does not excuse ALJ Brezina's duty to minimally articulate his reasons for rejecting an entire line of evidence favorable to Kastman.[4] Social security claimants are entitled to know the reason or reasons why the evidence they rely on is insufficient to obtain an award, and the courts need to know the same to conduct meaningful review. Accordingly, ALJ Brezina's decision, as currently written, cannot stand.

### E.    Failure to Make Proper Credibility Findings

Kastman's argument concerning ALJ Brezina's credibility findings is twofold: first, ALJ Brezina erred by finding not credible Kastman's testimony about being depressed four days per week; and second, ALJ Brezina erred by failing to assess the credibility of Kastman's testimony relating to his other mental problems.

A credibility finding will not be disturbed unless it is patently wrong. *Luna v. Shalala*, 22 F.3d 687, 690-91 (7th Cir. 1994); *Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir. 1993) (quoting *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986)). A credibility finding often involves

---

[4] We note that ALJ Brezina did not rely on Kastman's work history at the correctional center to discount his mental problems. As a reviewing court, we cannot supply a ground to sustain the agency's decision. *See O'Connor v. Sullivan*, 938 F.2d 70, 73 (7th Cir. 1991).

intangible or inarticulable elements that cannot be discerned from the transcript. *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) (quoting *Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989)). To the extent that a credibility finding rests on objective factors or fundamental implausibilities, however, the court has greater freedom to engage in review. *Herron*, 19 F.3d at 335.

In making a credibility finding, an administrative law judge must provide specific reasons for the weight given to the claimant's statements, supported by evidence in the record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting SSR 96-7p). In this regard, the court cannot presume that the administrative law judge disbelieved the claimant's testimony without a specific finding to that effect. *Schroeter v. Sullivan*, 977 F.2d 391, 395 (7th Cir. 1992) (quoting *Look v. Heckler*, 775 F.2d 192, 195 (7th Cir. 1985)).

With respect to ALJ Brezina's credibility finding regarding Kastman's testimony about his depression, we agree with Kastman that it cannot be sustained. The sole reason listed by ALJ Brezina to discount Kastman's testimony that he was depressed four days per week is that Kastman no longer received treatment for depression at the time of the hearing. (R. at 26.) But Kastman explained that he wanted further treatment outside of the prison setting at a halfway house because the treatment he was receiving in the prison setting was not helping him. (R. at 419, 422.) Kastman also explained in December 1999 that if he sought treatment he would feel "two-faced," considering his pending attempt to obtain a release from prison. (R. at 454.) Finally, the record indicates that Kastman is in denial, at least to a degree, as to the extent of his problems. (R. at 454.) Before rendering a credibility finding based on the treatment that Kastman was not receiving, we believe that ALJ Brezina should have inquired into these facts.

*See* SSR 96-7p ("When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements.")  At the hearing, ALJ Brezina did not even ask Kastman why he was not receiving treatment for his depression (R. at 490-91); instead, ALJ Brezina assumed facts unfavorable to Kastman's position, contrary to SSR 96-7p.

We also agree with Kastman that the ALJ erred by not making credibility findings on Kastman's statements regarding his other mental problems.  The specific credibility findings made by ALJ Brezina pertained to Kastman's depression around the time of the hearing—when he was not receiving treatment—and Kastman's physical limitations.[5]  As ALJ Brezina considered Kastman's ability to work with others, his ability to concentrate, and his ability to control his sexual impulses while not intoxicated, ALJ Brezina should have made credibility findings on Kastman's statements regarding these issues, too.  *See* SSR 96-7p.  As a matter of fact, ALJ Brezina should have made a credibility finding on Kastman's statements regarding his depression during the time that he was receiving treatment as well.

### F.    Reliance on the Medical-Vocational Guidelines

Kastman next claims that ALJ Brezina erred by relying on section 204.00 of the Medical-Vocational Guidelines to find Kastman disabled.  Use of the Medical-Vocational Guidelines to determine whether a claimant is capable of performing work in the economy is

---

[5] ALJ Brezina's conclusory finding that Kastman's "testimony as to the disabling effects of his medical problems was not credible" is, of course, ineffective. *See* SSR 96-7p.

inappropriate where the claimant suffers from nonexertional limitations that "are so severe as to limit the range of work that [the claimant] can perform." *Herron*, 19 F.3d at 336; *Nelson v. Sec'y of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985). In such a case, the Medical-Vocational Guidelines can provide a framework to guide the administrative law judge, but the administrative law judge should use the services of a vocational expert to determine "what work, if any, the claimant is capable of performing." *Nelson*, 770 F.2d at 684; SSR 83-14.

In his decision, ALJ Brezina determined that Kastman could "perform only simple, repetitive work with no contact with the general public or children and only limited contact with coworkers." (R. at 26.) Yet, without any citation or explanation, ALJ Brezina concluded that Kastman's aforementioned "nonexertional limitations . . . would not significantly erode the occupational base considered in section 204.00." (R. at 27.) SSR 85-15 alerts administrative law judges "that the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis." And SSR 85-15 informs that the intellectual and emotional demands of unskilled, competitive, remunerative work include "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."

In light of the deficiencies associated with ALJ Brezina's decision, as noted above, we make no finding on the propriety of ALJ Brezina's conclusion that Kastman's nonexertional

limitations would not significantly erode the occupational base considered in section 204.00 of the Medical-Vocational Guidelines. Depending on how the deficiencies are resolved, ALJ Brezina's conclusion, and hence his reliance on the Medical-Vocational Guidelines, may or may not be sustainable.[6] At this juncture, however, we do express skepticism regarding ALJ Brezina's reliance on the Medical-Vocational Guidelines in light of his conclusion that Kastman could have only "limited" contact with coworkers. As SSR 85-15 indicates: a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations on a sustained basis would severely limit the claimant's potential occupational base. And as the Seventh Circuit held in *Warmoth v. Bowen*: unless the effect of the limitation on the claimant's ability to work is obvious, the administrative law judge must refer to evidence to persuade a reasonable person that the claimant's limitation would not significantly diminish the employment opportunities otherwise available to him to rely on the Medical-Vocational Guidelines. 798 F.2d 1109, 1112 (7th Cir. 1986). For now, it suffices to say that ALJ Brezina did not refer to any evidence to support his reliance on the Medical-Vocational Guidelines, and we cannot discern what ALJ Brezina meant by his use of the word "limited."

### G.    Remedy

Based on the errors mentioned above, the fact that Kastman's case has already been remanded once, and the amount of time that Kastman's claims have been pending, Kastman

---

[6] For example, if Kastman's testimony that he could not concentrate is deemed fully credible and Dr. Anderson's testimony about Kastman's limitations is deemed fully accurate, then it appears that Kastman should be found disabled according to SSR 85-15. Indeed, Dr. Grenfell testified at the hearing before ALJ Trawick that no jobs would be available to a person who often experienced deficiencies in concentration, persistence, or pace. (R. at 100-01.)

argues that this Court should award benefits rather than remand his case for a second time. According to Kastman, it would be patently unfair to require him to present his case at the administrative level again.

A remand is appropriate where "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). On the other hand, an instruction to award benefits is appropriate where "substantial evidence on the record as a whole indicates that the claimant is disabled, and the weight of the evidence indicates that a remand would only delay the receipt of benefits while serving no useful purpose." *Bell v. Bowen*, 658 F. Supp. 533, 538 (N.D. Ill. 1987). These standards are consistent with the general rules for judicial review of agency actions and the dictates of § 405(g). *Seavey v. Barnhart*, 276 F.3d 1, 10-12 (1st Cir. 2001).

We have already indicated the line of evidence favoring Kastman's position. Briefly, this consists of the testimony of Dr. Anderson, Dr. Grenfell, and Kastman, and the medical evidence submitted by certain individuals who examined and evaluated Kastman over the years for his mental problems. But there is Dr. Hermsmeyer's opinion that Kastman had the mental capacity to perform simple tasks. (R. at 119.) And there is Dr. Hermsmeyer's opinion that Kastman's activities of daily living and social functioning were slightly limited, Kastman seldom had deficiencies of concentration, persistence, or pace, and no evidence existed to show that Kastman experienced an episode of deterioration in work. (R. at 128.) This opinion is nearly identical to ALJ Brezina's conclusion as stated in his Psychiatric Review Technique Form for October 1984 to the present. Furthermore, Kastman has been able to hold down a job requiring an eight-hour workday, five days per week at the correctional center for an extended period of time. (R. at 454,

485, 489.) And it is not clear whether Kastman's inability to hold down jobs outside of prison

resulted from his mental problems or from his abuse of alcohol. (R. at 59.) Surely some other

evidence antagonistic to Kastman's claims can be found in the record, but we need not catalog all

of it here. The point of all of this is merely to demonstrate that conflicts in the evidence exist

that must be resolved by an administrative law judge, and therefore, remand is appropriate.


**VI.     Conclusion**

For the reasons stated, this Court grants Kastman's motion in part and denies it in part.

This case is remanded to the Commissioner for further proceedings consistent with this decision.

**ENTER ORDER:**


**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** July 2, 2002.

Copies have been mailed to:

BARRY A. SCHULTZ, Esq.                    ANN L. WALLACE
The Law Offices of Barry A. Schultz, P.C.  Assistant U.S. Attorney
1609 Sherman Avenue                        219 South Dearborn Street
Suite 207                                  Suite 500
Evanston, IL  60201                        Chicago, IL  60604

Attorney for Plaintiff                     Attorney for Defendant